Fred D. Thompson
vs. } Equity No. 7799
Fannie E. Clarke
et al.

## RESCRIPT

### September 25, 1926

TANNER, P. J. This is a bill in equity brought by the complainant, as administrator of the will of one Henry L. Thompson, to obtain instructions and also to enforce a contract made between legatees and heirs at law of the said Henry L. Thompson, which said contract to some extent confirms the disposition of property made in said will of said Henry L. Thompson.

The chief ground of demurrer is that said contract is void for want of consideration.

It is true, as claimed in the demurrer, that the so-called bequest to said complainant in said will is void because he was a witness to the will. It appears, however, that the complainant and the respondent Eva M. Salisbury were the heirs at law of said Henry L. Thompson, and in a contract signed by the demurring respondent Fannie E. Clarke it is stated that there was some question as to the validity of said will. It seems, therefore, that the parties interested in the will saw fit to avoid the possibility that the will might be broken by entering into a contract for a division of the assets of the testator. This, we think, under the authorities was a sufficient consideration.

Another ground of demurrer is that the legatees, Henry F. Thompson and Waldo L. Thompson, did not sign the settlement contract, but neither of them was adversely affected by the contract, and, therefore, under the authorities we see no necessity for their having been parties to the contract.

A further ground of demurrer is that the bill is multifarious because it seeks to determine the rights of the respondent Van Ausdall in the stock which formed the main portion of the assets of the estate. As it relates, therefore, to the assets of the estate and the principal parties are interested in the question of the rights of said Van Ausdall, we think it would be convenient to determine the question in this case and that the bill is, therefore, not multifarious.

Demurrer overruled.

For Complainant: Ernest P. B. Atwood.

For Respondents: Knauer & Fowler; Quinn, Kernan & Quinn.

---

State
vs. } Indictment No. 470
William H. Landri

## RESCRIPT

### September 29, 1926

CAPOTOSTO, J. The defendant was found guilty of manslaughter under an indictment charging him with the death of one Thomas F. Connors through the reckless opera-

tion of an automobile on the West Shore Road in the Town of Warwick, on July 3, 1925.

The contention of the State in a general way is that, while the deceased was seated to the defendant's right on the front seat of the defendant's Buick touring car, the defendant drove the automobile in such a reckless manner around the sharp curve at Hoxie's Corner, so called, on the West Shore Road, as to lose control of the car, with the result that it first crashed against a telephone pole and then became impaled head on upon the end of a fence on the side of the highway.

The defendant interposed a double defence, namely, that the automobile was not driven in a reckless manner and that Connors and not himself was the driver of the car.

Was the automobile, in fact, driven in such a reckless manner as to make the driver, whoever he was, liable to a criminal prosecution?

The testimony of Carl Cresy, a colored chauffeur for Mrs. Alice M. Nichols, and the evidence of Mrs. Nichols herself as to the operation of the defendant's automobile some short distance from the Hoxsie curve furnishes disinterested proof of some person's reckless conduct. Both Cresy and Mrs. Nichols, who were city bound in Mrs. Nichols' automobile, testified in substance that a Buick touring car, with two men on the front seat, passed their car without warning and at a high rate of speed as Cresy was in the act of passing another car which preceded them; that they were forced to fall back to avoid a collision, and that they then watched the Buick car proceed towards the city at a continued high rate of speed, cutting in and out of the regular in-bound line and pushing opposing traffic off the road, and that a very short while afterwards, when they rounded the curve, they saw the Buick car im-

paled upon the fence.

Frederick H. Russack, who at that time was running a gasoline station at Hoxsie's corner almost directly across from the scene of the accident, testified that his attention was attracted to the city bound Buick touring car which attempted to make the sharp curve at that corner at a very high rate of speed, perhaps at the rate of some 40 or 50 miles an hour; that in cutting the corner the automobile just missed striking a telegraph pole on the left hand side of the highway, and that in attempting to get in line the automobile swung way over to the right side of the road. He further said that he then gave his attention to his business and did not see the collision, the noise of which he heard a few seconds later.

The defendant himself, in describing the operation of the car at Hoxsie's Corner, said that the driver of the automobile made a wide turn; that he went off the center of the road too far; that he then turned hard to the right to avoid an oncoming machine; that at the bridge, which is but a few hundred feet from the curve in question, the automobile was driven at a rate of between 25 to 30 miles an hour, and that he could not say whether or not this speed was slackened in rounding the curve.

The damage to the impaled automobile, which will be described more fully under the second phase of the defendant's contention, furnishes undeniable physical proof of great momentum at the time of impact. When all these facts are considered as a whole, after making due allowance for self interest and inaccurateness of observation due to stress of circumstances, the conclusion is irresistible that the automobile which figured in the accident was being operated by a driver who was so reckless in his management of the automobile as to disregard the most elementary

rules of self protection and to wantonly subject innocent third parties to the danger of death or serious bodily harm. Such an operator, who causes the death of a human being, is clearly guilty of manslaughter.

.The second main question raised by the defence is as to the identity of the driver. The State maintains it was the defendant; the accused claims that it was the deceased Connors. Who, in fact, was the driver as proved by the evidence? The answer to this question is to be found in the silent but forcible testimony of undeniable physical facts more than in the words of witnesses. If the conviction of Landri rested solely upon the imperfect identification of those who in the moment of self concern for their own safety or of distraction from their employment .caught but a fleeting glance of the reckless driver, the defendant would be justified in claiming that the State had failed to maintain the necessary burden of proof. So as to give the defendant every possible consideration, this Court finds that the spoken testimony of the chauffeur Cresy, of Mrs. Nichols, and of Russack, insofar as such testimony refers to the identity of the driver, while unquestionably sincere, is so fragmentary and uncertain as to be insufficient of itself, unless corroborated, to sustain the verdict. We consequently turn to the physical facts in evidence for assistance in arriving at a solution which will do justice to all concerned.

The position of the two wooden rails driven through the front of the automobile as the car was impaled upon the fence, the wounds received by the deceased, the silent testimony .of Connors' clothing, and the injury to the defendant's right wrist throw convincing light upon the person actually responsible for Connors' death. In describing the location of the two rails which were jammed into and through the automobile by the impact with the end of the highway guard fence, the description is given as if one were seated in the driver's seat of the defendant's left drive automobile. This element is of the greatest importance because the blow which caused Connors' death was inflicted by either one or the other rail, and as this question is determined, the driver of the car will be identified. One rail (hereafter called the radiator rail) came through the lower right corner of the radiator and, proceeding in an upward course of some 45 degrees, bore somewhat diagonally to the left, missed striking the motor, crashed through the cowl, passed between the speed lever and the emergency brake, and firmly imbedded the entering end in the upper part of the back cushion of the front seat, some 15 inches from the left side of the automobile. (State's Exhibits 1-F and 2-F.) The inside measurement of the front seat is 40½ to 41 inches. The second rail (hereafter called the windshield rail) escaped the hood of the automobile, scraped the cowl, broke through the glass of the windshield at the lower right corner and practically on a level with the top of the right front door of the car, passed over the top of the front seat and rested its forward end on the back of the rear seat within an inch or so of the rear curtain and some 18 inches from the right side of the rear seat. This rail came in on its flat side and ran straight back through the car. Both rails were planks 8 or 10 feet long, 6 inches wide and two inches thick, and painted white. White paint was visible on the right outer surface of the cowl where the windshield rail, which had remained attached at one end to its support, was removed by pulling the automobile away from the fence. The radiator rail, torn from the fence by the force of the collision

and firmly wedged in the automobile, was towed away in the wreck. This plank continued in its original position in the automobile until the defendant, a few days after the accident, went to the garage where the wrecked car had been stored and sawed it out.

With the position of these two planks fixed, let us turn our attention to the external evidence of violence on the body of the deceased. Connors was a reasonably tall, well developed man, weighing about 200 pounds, and older than the defendant. The injuries upon his body which are of most concern to us are those to the right chest, right arm and left leg. The sixth, seventh and eighth ribs on the right side were fractured. Upon the surface of the right side of the chest there was a well defined abrasion two inches in diameter. According to Dr. Austin H. Longfellow, the medical examiner, this abrasion, starting some three or four inches below the nipple, showed a depression as if some sharp edge had struck the chest wall just inside the nipple line and then had slid along the skin to the right, following the ribs. The inner side of the abrasion was well defined by a sharp line, while the outer or right side was not so closely delineated. This bruised area was described by Dr. Longfellow as "a number of scratches in parallel direction * * * a scratching of the skin." On the outer side of the right arm, in the region of the bicepts muscle, there was another similar depression of a slighter nature. Upon the left leg there were abrasions on the front and outer side of the leg below the knee. The coat and trousers which Connors wore at the time of the accident show a tear more or less lengthwise along the outer side of the left trouser leg below the knee, particles of a white substance resembling paint in this same general locality, and a small tear in the right

coat sleeve some distance above the elbow. According to Chief of Police Cranston, who saw the defendant shortly after the accident, Landri had a mark, which he described as if the "skin had been rubbed up," running diagonally on the under part of the right wrist. This testimony the defendant contradicts by saying that he had no such bruise as far as he could remember.

The defendant's version of the occurrence must be outlined, at least in a general way, in order to place these various facts and circumstances in their proper relation to each other. Omitting minor details, Landri's claim is that he finished his work as night watchman in the freight yard at about 2 A. M. and drove his automobile to the Majestic Garage, from which place he, in company with Connors whom he had accidentally met there, started for a restaurant on Broad Street some time later; that they had some food in the restaurant, purchased some sandwiches and went to the defendant's home on Bridgham Street, a short distance away; that Mrs. Landri got out of bed, made some coffee, and they ate again; that after an hour or so, the defendant, accompanied by Connors, started for his automobile, it being the defendant's intention to drive Connors to his home, which was some two blocks away; that as he was going out, Mrs. Landri called him back and that when he came out again, Connors was seated at the wheel and asked to run the car, which he allowed him to do. The defendant further testified that when they got to the corner of Elmwood Avenue and Bridgham Street, they decided for the first time to take a ride, drove to the water front at Oakland Beach and stopped there for about three-quarters of an hour, enjoying the view while they sat talking and smoking in the car; that neither had anything to drink and both were sober; that they then

started back and followed the West Shore Road toward the place of the accident.

"Did you pass any machines on your ride from Oakland Beach to this point?" Ans. "The only machines I remember, there was two or three machines stopped at the crossing there at Shawomet. You mean the railroad crossing?" Ans. 'The trolley crossing there. The trolley car going by when I went right by there and that is the only car I remember we went by."

After detailing how they proceeded around the Hoxsie curve as described in the first part of this rescript, the defendant said that while the deceased had both hands on the steering wheel, he noticed that Connors was losing control of the automobile, and that the first thing ne knew they hit a telegraph pole and then crashed into the fence which was not over 25 feet away.

Although the defendant makes no claim of being stunned or dazed in any way, he said that when he came to after the accident, he found himself with one plank over his right shoulder, the other to his left, and with Connors seated in his lap. As to how he got out and what he did for Connors after the impact, the defendant said that he wiggled out from under Connors, climbed over the plank which rested above his right shoulder, got out from the right side of the automoblie, took Connors out from that same right side, and, with the assistance of two men whom he did not know, dragged Connors around the rear of the car to the automobile of one Goodman in which Connors was taken to the hospital.

The only reference that need be made to Mrs. Landri's testimony is as to that portion of her evidence where she stated that she did not see the defendant when he left the house because she was in bed with the children.

Mrs. Ellen S. Hoxsie and her fifteen year old son, Albert Irving Hoxsie, who lived almost directly across from the place of the accident, testified, among other things, that they were attracted by the noise of the crash and ran out to see what had happened; that they saw the automobile up against the fence with one man in a "slumping" or slouching position in the front seat next to the fence, and no one in the driver's seat; that another man, younger and not so heavy, who had his back towards them, was standing on the left running board and by reaching over the steering wheel, succeeded in pulling the injured man out by the left door.

Herman E. Goodman, who gave his occupation as a dealer in food products, which turned out to be restricted to malt and hops, said that while on the way to the hospital with the defendant and Connors in the coupe, he smelled liquor on the breath of these men, but could give no further information.

In view of the peculiar circumstances surrounding the accident, the defendant's claim, and the lack of positive human identification, this Court out of extreme caution has felt it its duty to give a more specific written analysis of the testimony than is usually the case. The physical facts distinctly indicate that the blow which injured Connors was a glancing one. The two square inch abrasion or scratch on the chest, made up of practically parallel lines following the course of the ribs, to the right corresponds in in size to the thickness of the windshield rail as it came through on its flat side. The parallel lines which compose the bruise are what experience has taught would ordinarily result from coming in contact with the rough edge of a board. The similar abrasion on the right arm and the tear on the outer surface of Connor's right coat sleeve in the

region of the biceps muscle, which brings it in line with the chest injury, are reasonably the result of the same force which, after striking the right chest, was further deflected to the right. The injuries to the outer surface of the left leg below the knee and the character of the tear on the outer side of the left trouser leg, at or about the same place, are explained by the application of a force moving lengthwise and somewhat upward along the affected limb. The faint but yet discernible traces of a white substance resembling white paint, in the immediately vicinity and following the course of the tear, indicate quite distinctly that the force which caused the damage was exerted by some object painted white. If the defendant had a rubbing of the skin on the under surface of the right wrist, which the Court believes to have been the fact in spite of the defendant's evasive denial, such injury could be reasonably attributed to the same force which passed by the left leg of the deceased. A person who cramps his wheel hard and sharply to the right would naturally bring his lower right wrist in close proximity to the seat of the car.

With these facts and considerations in mind, one feels quite firmly convinced that the windshield rail struck Connors on the chest, and that the radiator rail injured Connor's left leg and the under part of the defendant's right wrist. If further corroboration is sought, one has but to turn to the evidence of the defendant and the claim of counsel on his behalf. The contention of the defence is that the fatal injury which Connors received was inflicted by the radiator rail in some undefined manner while the deceased was being jostled or moved to his right, out of the driver's seat, at the time of the impact. The manner in which the guard rail is imbedded in the back of the front seat, as shown by the exhibits here-inbefore referred to, indicates the result of a terrific blow. Counsel for the defendant seeks to ascribe to the deceased, by inference at least, almost incredible agility of body, which means, in substance, that we are asked to find that, as the collision occurred, one of two things happened: either that the deceased, a two hundred pound man, attempted to get out of the path of the radiator rail which was crashing through the front of the car, by leaving the driver's seat, freeing his feet from gear shift and emergency brake, and placing himself in the defendant's lap; or, that the force of the collision itself removed him from behind the wheel, carried him by intervening obstacles, and landed him in a sitting position on the defendant.

The defence then argues that, as Connors was moving to his right as a result of either voluntary or forced motion, the radiator rail came through and struck him. While ingenious, this theory is not supported by the evidence. The radiator rail was so firmly jammed into the automobile as to allow no side motion of any sort. Its course was distinctly from the left and diagonally upward. If the blow were struck by the end of this rail, the natural result would be an injury showing the same characteristics. If this rail struck him, then the injury would in all human probability have been distinctly on the left side of Connors' chest and not on the right side as it, in fact, was. It would have shown evidence of an upward rather than a lateral motion of the object doing the damage; and the rail being firmly fixed, excepting as to its forward movement, the injury would have shown evidence of a penetrating rather than of a sliding or a slipping nature.

The answer of the defendant, specifically quoted in another part of this rescript, to the question of his

own counsel as to whether or not he passed any machines on his ride from Oakland Beach to the point of the accident, was impressive to say the least. Was the phrase: "when I went right by there," a mistake of expression or was it the voice of conscience? The facts all indicate that the defendant did drive his car by that crossing, so that the defendant's words "I went right by there" are consistent with guilt and not with innocence.

The defendant's testimony stands flatly contradicted on vital points by three witnesses at least: by his own wife, by Mrs. Hoxsie, and by Albert Hoxsie. The defendant positively stated that as he was going out of his home with Connors his wife called him back, and that when he came out again, he found Connors at the wheel of his automobile. Mrs. Landri, on the other hand, testified that she did not see the defendant when he left the house because she was in bed with the children. Weighing the credibility of the evidence on this point, the Court is satisfied that the defendant was not called back by Mrs. Landri and that he and Connors went off together to the automobile. The only purpose whch the defendant could have had in mind in interjecting such a phrase was to give an apparent excuse for placing Connors in the driver's seat. The testimony of Mrs. Hoxsie and her son, disinterested and apparently truthful witnesses, is in direct contradiction of defendant's evidence as to how Connors was taken out of the Landri car. The defendant asserted that he extricated himself from the hemmed in position which he described, got out on the right, pulled Connors out from that side, and by taking Connors around the rear of his automobile got him to

Goodman's car. Mrs. Hoxsie and Albert Hoxsie both said that the man who got Connors out of the wreck was standing on the left running board and by reaching over the steering wheel, succeeded in getting the deceased out from the left side of the car. Both versions can not be correct. In weighing the testimony on this point, reason, supported by the absence of motive for misrepresentation, compels us to accept the testimony of the Hoxsies as true.

The evidence of Goodman, the malt and hop merchant, as to the odor of liquor which permeated his coupe while taking the defendant and Connors to the hospital, makes one wonder whether the automobile ride was aimlessly taken to enjoy the beauties of a bright July morning along our shores, as the defendant contends, or for some other purpose. Whatever the real object of the trip may have been, the testimony of Goodman, who showed considerable reluctance in testifying as a witness for the State, established the fact that liquor had been used so recently by either or both of these men as to make its odor apparent in the closed car.

The Court has given plenty of time and thought to the facts and circumstances in this case in order to give the defendant the benefit of any possible reasonable doubt. After a minute and scrupulous consideration of all the testimony, both physical and oral, the Court is impelled by the overwhelming weight of the credible evidence to the conclusion that the automobile in question was not only driven in an extremely wanton and reckless manner, but that the car so driven was operated by the defendant Landri himself.

The jury's verdict is just. Motion for new trial denied.

For State: Assistant Attorney General Louis V. Jackvony.

For Defendant: Alberic A. Archambault.